IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBEDIAH WALKER III, As Executor of the Estate of Obediah Walker, Jr. | |
| Plaintiff, | MDL 875 |
| v. | CIVIL ACTION NO. 16-5349 |
| BLACKMER PUMP CO., et al., | |
| Defendants. | |

## OPINION

**Slomsky, J.**                                                                                    **February 14, 2019**

## I.    INTRODUCTION

On February 5, 2014, Plaintiff Obediah Walker III ("Plaintiff") filed this action in state court, claiming that his father, Obediah Walker, Jr. ("Decedent"), developed lung cancer after being exposed to asbestos-containing products while serving in the United States Navy.[1]  (Doc. No. 1 at 28.)   Named as Defendants are several manufactures,[2] including Defendant Ingersoll-Rand

---

[1]    As discussed infra, this is the first of two lawsuits filed by Plaintiff Obediah Walker III regarding his father's alleged exposure to asbestos while serving in the United States Navy.  The second suit was filed on November 25, 2015 in the Court of Common Pleas of Philadelphia County. See Walker v. Amtrol, Inc., Civ. No. 3723 (Ct. Com. Pl. Philadelphia, filed Nov. 25, 2015).  That case was removed to the United States District Court for the Eastern District of Pennsylvania on January 15, 2016.  See Walker v. Amtrol, Inc., Civ. No. 16-215 (E.D. Pa. filed Jan. 15, 2016). On February 3, 2017, United States Magistrate Judge Thomas J. Reuter ordered that the two cases be consolidated under Civ. No. 16-215 pursuant to Federal Rule of Civil Procedure 42 because both cases involve the same plaintiff and the same decedent, and share common questions of law and fact.  (Doc. No. 15.)

[2]    Named as Defendants were: (1) Blackmer Pump Co.; (2) Buffalo Pumps, Inc.; (3) Carrier Corporation; (4) CBS Corp.; (5) Copes-Vulcan, Inc.; (6) Foster Wheeler Corporation; (7) General Electric Company; (8) Goulds Pumps Inc.; (9) IMO Industries, Inc.; (10) Ingersoll-Rand Company; (11) Patterson Pump Co.; (12) Tyco International (US), Inc.; (13) Tyco Valves & Controls, Inc.; (14) Union Carbide Corporation; and (15) Warren Pumps.  At present, only

Company, Defendant Warren Pumps, and Defendant Blackmer Pump Co., all of whom are alleged to have manufactured and sold products to the Navy that contained asbestos or needed asbestos-containing products to function properly. (Id. at 25-35.)

On October 12, 2016, this action was removed from the Court of Common Pleas of Philadelphia County to the United States District Court for the Eastern District of Pennsylvania as part of MDL-875.[3] (Id. at 1.)

At present, there are three motions before the Court: (1) Defendant Ingersoll-Rand Company's Motion for Summary Judgment, filed on July 31, 2017 (Doc. No. 17); (2) Defendant Warren Pumps' Motion for Summary Judgment, filed on July 31, 2017 (Doc. No. 18); and (3) Defendant Blackmer Pump Co.'s Motion for Summary Judgment, filed on August 1, 2017 (Doc. No. 22). On August 31, 2017, Plaintiff filed Responses in Opposition to Defendants' Motions for Summary Judgment. (Doc. Nos. 23, 25, 26.) Then, on September 14, 2017, each Defendant filed Replies to Plaintiff's Responses in Opposition to their Motions. (Doc. Nos. 27, 28, 29.) Finally, on February 28, 2018, the Court held a hearing on Defendants' Motions for Summary Judgment. (Doc. No. 53.)

---

Defendants Ingersoll-Rand Company, Warren Pumps, and Blackmer Pump Co. remain in the case.

[3] Multidistrict litigation is litigation comprised of multiple civil cases involving one or more common questions of fact, but the cases are pending in different districts. Such actions may be transferred to any single district for coordinated or consolidated pre-trial proceedings. 28 U.S.C § 1407. Which district to send cases to falls to the discretion of the United States Judicial Panel on Multidistrict Litigation, as authorized by 28 U.S.C. § 1407. In 1991, the Judicial Panel on Multidistrict Litigation transferred all cases involving personal injury damages caused by asbestos products to the Eastern District of Pennsylvania in what is now known as MDL-875. See In re Asbestos Products Liability Litigation (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991).

Defendants' Motions for Summary Judgment are now ripe for disposition.[4] For reasons discussed <u>infra</u>, Defendant Ingersoll-Rand Company's Motion for Summary Judgment (Doc. No. 17) will be denied, Defendant Warren Pumps' Motion for Summary Judgment (Doc. No. 18) will be denied, and Defendant Blackmer Pump Co.'s Motion for Summary Judgment (Doc. No. 22) will be denied.

## II. BACKGROUND

### A. Decedent's Alleged Exposure to Asbestos-Containing Products

In 1969, Decedent Obediah Walker, Jr. enlisted in the United States Navy, and from 1969 until 1971, served on active duty as an electrician aboard the U.S.S. Plymouth Rock. (Doc. No. 23-2 ¶ 8.) Plaintiff claims that Decedent's work aboard the U.S.S. Plymouth Rock exposed him to asbestos.[5] (Doc. No. 1.)

James Owens was one of Decedent's supervisors on the U.S.S. Plymouth Rock. (Doc. No. 23-5 at 18:23-19:2.) According to Mr. Owens, electricians like Decedent maintained the electrical systems on the U.S.S. Plymouth Rock, and as a result, worked on every part of the ship. (<u>Id.</u> at 19:21-20:9.) Most frequently, electricians stood watch in the ship's engine room. Mr. Owens testified that electricians like Decedent "stood four-hour watches in the engine room every day on a rotating basis . . . . [s]o roughly, 50 percent of [their] time . . . was spent in the engine room." (<u>Id.</u> at 20:10-16.) Much of the machinery in the engine room was covered in insulation. Mr.

---

[4] At this point in the proceedings, these are the only open motions for summary judgment in Civ. No. 16-5349. There is one open motion for summary judgment in Civ. No. 16-215, which the Court will resolve in another Opinion and Order issued this day.

[5] Asbestos is a naturally occurring, fibrous mineral found in the earth. Known as a versatile "miracle substance," asbestos has been used as insulation; in building materials such as shingles and tiles; as friction products in automobiles; and in various other heat-resistant materials. Hon. Eduardo C. Robreno, <u>The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?</u> 23 WIDENER L.J. 97, 101 (2013).

Owens did not know it at the time, but testified that he later learned that this insulation contained asbestos. (<u>Id.</u> at 25:6-26:2.) He does not recall whether any of this machinery contained asbestos warning labels. (<u>Id.</u> at 70:25-71:3.)

Also working in the engine room were machinists, whose job it was to repair equipment like boilers, turbines, pumps, and valves. Electricians often helped machinists with repairs. First, the machinist would remove any asbestos-containing insulation that covered the piece of equipment. (<u>Id.</u> at 25:18-21.) According to Mr. Owens, the insulation would break "into pieces because it was brittle after being exposed to heat. The engine room itself was generally around 115 degrees." (<u>Id.</u> at 27:15-19.) Next, the electrician would disconnect the power and remove the equipment's electric motor. (<u>Id.</u> at 23:11-17.) Finally, the machinist would start the repairs. Mr. Owens testified that Decedent would have been present when machinists removed insulation from equipment in the engine room. (<u>Id.</u> at 26:5-7.) In his deposition, Mr. Owens acknowledged that working in the engine room was dangerous because electricians like Decedent were likely exposed to asbestos fibers when insulation was stripped from machinery. (<u>Id.</u> at 32:18-33:4.)

Mr. Owens also stated that Decedent worked on pumps on the U.S.S. Plymouth Rock. (<u>Id.</u> at 22:22-23:3.) Depending on the type of pump, it would have been wrapped in asbestos-containing insulation. Mr. Owens did not identify any specific manufacturers of pumps aboard the ship.

**B. Decedent's Death from Lung Cancer**

In late December 2013, Decedent, who smoked for much of his life, was diagnosed with mesothelioma.[6] (Doc. No. 23 at 2.) He passed away on March 17, 2014, less than four months

---

[6] Mesothelioma is a form of cancer that affects the lining of the chest cavity or the peritoneum. Most types of mesothelioma are thought to be related to asbestos exposure. <u>Mesothelioma</u>,

later.  (Doc. No. 23-4.)  After his death, post-mortem pathology testing showed that Decedent did not suffer from mesothelioma; rather, he died from invasive non-small cell carcinoma, a type of lung cancer.  (Doc. No. 23-9.)

For the purposes of this litigation, Plaintiff commissioned an expert report to evaluate whether Decedent was exposed to asbestos while aboard the U.S.S. Plymouth Rock.  The expert was Kenneth S. Garza,[7] CIH, MS, a Certified Industrial Hygienist with over thirteen years of experience conducting inspections of asbestos-containing products.  (Doc. No. 23-10.)  After reviewing Decedent's history, documents provided by Plaintiff, and relevant asbestos-related scientific literature, Mr. Garza provided the following opinions in a report he authored:

A. According to the Sections above, based on industrial hygiene, scientific, regulatory, and other documents, these products were asbestos-containing.

B. When these asbestos-containing products were installed, removed, cut, manipulated, repaired, or in any way disturbed, workers and bystanders were exposed to significant airborne concentrations of asbestos.  Significant contamination of clothing in asbestos occurs during the installation, removal, cutting, manipulation, repairing, or in any way disturbing of an asbestos-containing product.

C. Significant exposure to asbestos is due to the installation, removal, cutting, manipulation, repairing, or in any way disturbing of an asbestos-containing product in such a manner that airborne asbestos-fiber concentration is released above background concentration . . . .

D. When the asbestos products were installed, removed, cut, manipulated, repaired, or in any way disturbed, Mr. Walker, while working with such

---

MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/mesothelioma/symptoms-causes/syc-20375022 (last visited: Jan. 15, 2019).

[7] Mr. Garza earned his Bachelor of Science degree in Biology, with a minor in Chemistry from St. Mary's University in San Antonio, Texas in 2001.  He earned his Master of Science degree in Environmental Science and Management at the University of Texas in 2006.  He is a Certified Industrial Hygienist, a Texas Licensed Asbestos Consultant, and a Texas Licensed Mold Assessment Consultant.  (Doc. No. 23-10 at 51.)

products or as a bystander, was exposed to significant airborne concentrations of asbestos for each type of product.

E. Airborne asbestos does not settle quickly from the air and can easily become re-entrained[8] after it does settle.

F. Since the 1930s, working with or around hazardous contaminants in the work place, the need for engineering control, appropriate training, or appropriate respiratory protection was recommended. Asbestos was included among these workplace hazards. Good industrial hygiene practices would have included warnings.

G. I found no evidence of engineering controls, appropriate training, adequate warnings, or appropriate respiratory protection. The concepts of engineering control, appropriate training, and appropriate respiratory protective equipment, working in concert, will reduce exposure to airborne asbestos.

H. The dangers of exposure to asbestos-containing products have been well documented in the scientific literature. By the 1930s, asbestosis had been thoroughly documented in the industrial hygiene literature (Merewether, 1930). In 1955, the link between asbestos exposure and lung cancer had been firmly established in public health and industrial safety literature (Doll, 1955). In 1965, the link between asbestos exposure and mesothelioma had been firmly established in public health and industrial safety literature (Newhouse, 1965).

I. My opinions may be supplemented or changed if new evidence/information is presented to me. I declare under penalty of perjury that the foregoing is true and correct.

(Id. at 32-33.)

Additionally, after Decedent's death, Jerrold L. Abraham, M.D., Professor of Pathology and Director of Environmental and Occupational Pathology at Upstate Medical University, reviewed Decedent's records and history for the purposes of this litigation. (Doc. No. 23-9.) He concluded the following:

Asbestos exposure is well known to increase the risk of development of lung cancer, acting synergistically with cigarette smoking. It is not necessary for there to be a

---

[8] Re-entrainment is the phenomenon whereby dust is collected from the air stream and is then returned to the air stream, where it remains. Re-entrainment. DICTIONARY.UNIVERSITY http://dictionary.university/RE-ENTRAINMENT (last visited: February 5, 2019).

diagnosis of asbestosis for asbestos exposure to cause lung cancer, since asbestosis and lung cancer are two separate adverse outcomes from asbestos exposure. Mr. Walker had a history of asbestos exposure and smoking and developed a primary lung cancer. Based on this information I can conclude to a reasonable degree of medical certainty that Mr. Walker's asbestos exposure was, along with his smoking, a substantial contributing causal factor in the development of his lung cancer.

(Id.) In short, Dr. Abraham concluded that Decedent's lung cancer was caused in part by his exposure to asbestos.

### C. Defendant Ingersoll-Rand Company

Plaintiff claims that a fire pump aboard the U.S.S. Plymouth Rock was manufactured by Defendant Ingersoll-Rand Company and that Decedent was exposed to asbestos when machinists stripped insulation from that pump in his presence. (Doc. Nos. 1, 25.) In support of this claim, Plaintiff first points to the Synopsis of Machinery and Hull Data for the U.S.S. Fort Snelling, a naval ship in the same class as the U.S.S. Plymouth Rock. (Doc. No. 25-6.)

The cover page of the Synopsis states that the document summarizes the machinery aboard the "U.S.S. LSD 29," which Plaintiff concedes is the U.S.S. Fort Snelling, and not the U.S.S. Plymouth Rock.[9] (Doc. No. 36-6 at 1; Doc. No. 61 at 23:4-19.) However, the Synopsis also notes that the document summarizes machinery aboard every ship that falls within the "U.S.S. LSD 28" class of Navy vessels, which includes U.S.S. LSD 28, U.S.S. LSD 29, U.S.S. LSD 30, and U.S.S. LSD 31. (See Doc. No. 25-6.) At the hearing on February 28, 2018, Plaintiff represented that the U.S.S. LSD 30 is the U.S.S. Plymouth Rock. (Doc. No. 61 at 23:4-19.) Significant here, the Synopsis states that the fire pump aboard ships within the U.S.S. LSD 28 Class, including the U.S.S. LSD 30, was manufactured by Ingersoll-Rand Company. (Doc. No. 25-6 at 16.) A fire pump is a piece of equipment that provides the pressure for a water supply system if there is a fire

---

[9] "LSD" refers to "landing ship dock." (Doc. No. 1-1 at 32:14-20.)

aboard a ship.  The Synopsis states that the pump was a centrifugal fire pump that was turbine-driven, as opposed to motor-driven.  (Id.)

Second, in further support of its claim against Defendant Ingersoll-Rand Company, Plaintiff cites to an Ingersoll-Rand Company packing manual for centrifugal fire pumps.  (Doc. No. 25-7.)  The manual states that centrifugal fire pumps that pump water ranging from cold to 220 degrees Fahrenheit should be packed with cotton or non-reinforced asbestos.  Centrifugal fire pumps that pump water exceeding 220 degrees Fahrenheit should be packed with reinforced asbestos.  (Id. at 3.)  Further, the manual states that "[n]o pump will give satisfactory, trouble-free operation over long periods unless particular care and attention are given to the selection and installation of the type of packing best suited for the liquid to be handled and the service conditions under which the pump is to operate."  (Id.)

Finally, Plaintiff cites to an Ingersoll Rand-Company instruction manual for boiler feed pumps, which states that this type of pump requires an "asbestos spacer."  (Doc. No. 25-8.)  There is no evidence that there was an Ingersoll-Rand boiler feed pump aboard the U.S.S. Plymouth Rock.

**D.  Defendant Warren Pumps**

Likewise, Plaintiff claims that certain pumps aboard the U.S.S. Plymouth Rock were manufactured by Defendant Warren Pumps and that Decedent was exposed to asbestos when machinists stripped insulation from these pumps in his presence.  (Doc. Nos. 1, 26.)  To support this claim, he cites to Synopsis of Machinery and Hull Data for the U.S.S. Fort Snelling, which, as noted above, is a naval ship in the same class as the U.S.S. Plymouth Rock.  (Doc. No. 26-6.)  The Synopsis states that the following pumps on the U.S.S. Plymouth Rock were manufactured by

Warren Pumps: (1) the emergency feed pump; (2) the main circulating pump; and (3) the bilge & fuel oil tank stripping pumps. (Id. at 12-15.)

Additionally, Plaintiff has provided documents that show that Warren Pumps specified that steam cylinders on its main circulating pumps and bilge and fuel oil tank stripping pumps should be "insulated with suitable thickness of 85% magnesia." (Doc. No. 26-7.)  In general, products that were 85% magnesia were asbestos-containing products.[10]  (Doc. No. 26 at 6.)  Further, a blueprint of a Warren Pumps bilge and fuel oil tank stripping pump shows that this type of pump contained an insulating ring made of asbestos.  (Doc. No. 26-8 at 4-5.)  A blueprint of a Warren Pumps emergency feed pump shows that this type of pump also contained an asbestos insulation ring.  (Id. at 2-3.)  Finally, invoices between Warren Pumps and the United States Navy demonstrate that Warren Pumps supplied the Navy with a myriad of asbestos-containing parts for use on its pumps, including "asbestos sheet gaskets" and "braided asbestos" packing.  (Doc. Nos. 26-9, 26-10.)

### E.  Defendant Blackmer Pump Co.

Finally, Plaintiff claims that a pump aboard the U.S.S. Plymouth Rock was manufactured by Defendant Blackmer Pump Co. and that Decedent was exposed to asbestos when machinists stripped insulation from this pump in his presence.  (Doc. Nos. 1, 23.)  In support of this claim, Plaintiff again cites to the Synopsis of Machinery and Hull Data for the U.S.S. Fort Snelling, which, as noted previously, is a naval ship in the same class as the U.S.S. Plymouth Rock.  (Doc. No. 23-6.)  The Synopsis states that the D.O transfer pump aboard the U.S.S. Plymouth Rock was manufactured by Blackmer Pump Co.  (Id. at 14.)

---

[10]  Magnesia 85% was an insulation product that contained up to 15% asbestos fibers.  Barry I. Castleman, Asbestos: Medical and Legal Aspects 372 (5th ed.)  (See Doc. No. 26-6.)

Plaintiff also cites to a Blackmer Pump Co. informational packet that states that pumps manufactured by Blackmer Pump contain "teflon impregnated asbestos" packing and an asbestos gasket. (Doc. No. 23-7.)  Further, a Blackmer Pump advertisement from October 1936 states that pumps manufactured by Blackmer Pump Co. come equipped "with every desirable feature." (Doc. No. 23-8.)  From the advertisement, it is unclear whether pumps manufactured by Blackmer Pump already contain asbestos-containing packing and gaskets before they are shipped.  (Id.)

### F.  Procedural History

Plaintiff filed two state court actions related to Decedent's alleged exposure to asbestos-containing products while serving in the United States Navy.  First, on February 5, 2014, Plaintiff filed the present action against fifteen manufacturers in the Court of Common Pleas of Philadelphia County, alleging that their products exposed Decedent to deadly asbestos.  See Walker v. Blackmer Pump Co., Civ. No. 0365 (Ct. Com. Pl. Philadelphia, filed Feb. 5, 2014).

Six days after this lawsuit was filed, Decedent testified at a videotaped deposition at the Philadelphia Veterans Affairs Medical Center, where he was living in hospice at the time.  Counsel for Defendants Ingersoll-Rand Company, Warren Pumps, and Blackmer Pump Co. were present, but did not cross-examine Decedent.  As noted above, on March 17, 2014, Decedent succumbed to lung cancer.  He never submitted to a subsequent deposition, and thus, counsel for Defendants never developed his testimony through cross-examination.  On October 12, 2016, this case was removed to this Court.

Meanwhile, on November 25, 2015, Plaintiff filed the second state court action, this time suing seven new manufacturers.  See Walker v. Amtrol, Inc., Civ. No. 3723 (Ct. Com. Pl. Philadelphia, filed Nov. 25, 2015).  That case was removed to this Court on January 15, 2016.  See

<u>Walker v. Amtrol, Inc.</u>, Civ. No. 16-215 (E.D. Pa. filed Jan. 15, 2016). Only Viad Corporation remains as a defendant in that case and the disposition is covered in another Opinion and Order.

## III.     STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  <u>Favata v. Seidel</u>, 511 Fed. App'x 155, 158 (3d Cir. 2013) (quoting <u>Azur v. Chase Bank, USA, Nat'l Ass'n</u>, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  <u>Favata</u>, 511 Fed. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  <u>Id.</u> (quoting <u>Azur</u>, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Id.</u> (alteration in original) (quoting <u>Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.</u>, 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  <u>Anderson</u>, 477 U.S. at 247–249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court

must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.

If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.    ANALYSIS

In their respective Motions for Summary Judgment, Defendants make substantially similar arguments.  First, all three Defendants argue that the Court cannot consider Decedent's testimony because the deposition is inadmissible hearsay.  Second, Defendants contend that they are entitled to summary judgment because there are no genuine issues of material fact as to whether their respective products were a substantial factor in causing Decedent's lung cancer.  Finally, Defendants advance the "bare-metal defense"—that is, they argue that their respective products did not contain asbestos when they were sold to the Navy and that they are not responsible for asbestos-containing products manufactured by others that were added to their products after they were sold.  (See Doc. Nos. 17, 18, 22.)  For these reasons, Defendants all contend that they are entitled to judgment as a matter of law.

Plaintiff disagrees.  As an initial matter, Plaintiff contends that Decedent's testimony is admissible because it falls within the former testimony exception to the hearsay rule.  Next, Plaintiff submits that he has identified evidence from which a reasonable jury could find that each of Defendants' respective products played a substantial factor in Decedent's death.  Lastly, Plaintiff argues that Defendants are not entitled to the bare-metal defense.  (See Doc. Nos. 23, 25, 26.)  As a result, Plaintiff urges the Court to deny Defendants' Motions for Summary Judgment and give him his day in Court.

The Court will first address Defendants' hearsay argument.  Thereafter, the Court will evaluate Defendants' contentions seriatim.

### A. Decedent's Deposition Testimony is Inadmissible Hearsay

It is well established that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). Defendants argue that Decedent's deposition testimony is inadmissible hearsay, and as a result, the Court should not consider it at this stage of the proceedings because it cannot be admitted at trial. (Doc. Nos. 17, 18, 22.) Plaintiff disagrees. He contends that the deposition is admissible because it falls within the former testimony exception to the hearsay rule. (Doc. No. 23, 24, 25.) For the reasons discussed below, the Court is persuaded by Defendants' argument.

Federal Rule of Civil Procedure 32 governs the use of depositions at trial. At trial, a party may introduce the deposition of a witness who has died so long as the deposition is admissible under the Federal Rules of Evidence. Fed. R. Civ. P. 32(a)(1)(B). A declarant's out-of-court statement offered for its truth is generally inadmissible hearsay because such a statement lacks the reliability of testimony personally proffered at trial, under oath, and subject to cross-examination. See Fed. R. Evid. 802; see also Plastipak Packaging, Inc. v. DePasquale, 75 Fed. App'x 86, 91 (3d Cir. 2003). But exceptions to the hearsay rule exist. Relevant here, Federal Rule of Evidence 804(b) provides that testimony that was given at a deposition and is "now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination" is admissible so long as the declarant is "unavailable as a witness." A declarant who is dead is considered unavailable for the purposes of Rule 804. See Fed. R. Evid. 804(a)(4).

In this case, the parties contest whether Defendants had an opportunity to cross-examine Decedent. As noted above, Plaintiff filed the present lawsuit on February 5, 2014 in the

Philadelphia County Court of Common Pleas. See Walker v. Blackmer Pump Co., Civ. No. 0365 (Ct. Com. Pl. Philadelphia, filed Feb. 5, 2014). Named as Defendants in that suit were Blackmer Pump Co., Buffalo Pumps, Inc., Carrier Corporation, CBS Corp., Copes-Vulcan, Inc., Foster Wheeler Corporation, General Electric Company, IMO Industries, Inc., Ingersoll-Rand Company, Patterson Pump Co., Tyco International, Inc., Tyco Valves & Controls, Inc., Union Carbide Corporation, and Warren Pumps. Id.

On February 11, 2014, six days after Plaintiff filed the first state court action, Decedent testified at a videotaped deposition at the Philadelphia Veterans Affairs Medical Center, where he was living in hospice at the time. The deposition began at 10:16 a.m. For the first two hours, Plaintiff's counsel questioned Decedent. Then, counsel for Defendant Union Carbide Corporation, who is no longer a Defendant in this matter, questioned Decedent for about an hour. During that hour, Decedent started to become groggy and forgetful:

| | |
|---|---|
| Defense Counsel: | How did your father die? |
| Decedent: | It was sore, the back. And some of the education and everything. Over the years, my back got weaker and weaker. So anyway— |
| Defense Counsel: | Mr. Walker, we're not talking about your back. I'm talking about your father, your dad. |
| Decedent: | Oh, oh. |

(Doc. No. 1-1 at 15:23-16:6.)

Further, it appeared that Decedent did not know that he was in the Veterans Affairs Medical Center in Philadelphia or what year it was:

| | |
|---|---|
| Defense Counsel: | Do you know where you are right now? |
| Decedent: | Yeah. |
| Defense Counsel: | Where? |

14

| Decedent: | Williams – Williamsport, Williamsport defendant – defense hospital. |
| --- | --- |
| Defense Counsel: | Okay. Are you in – you think you're in Williamsport right now? |
| Decedent: | Yeah |

***

| Defense Counsel: | Do you know what year it is? |
| --- | --- |
| Decedent: | Yeah. |
| Plaintiff's Counsel: | Objection. |
| Decedent: | 1914. |

(<u>Id.</u> at 29:4-11, 30:7-11.)

When Decedent left the deposition room at 1:41 p.m., the parties present discussed whether

to start cross-examination:[11]

| Defense Counsel I: | . . . As I understand, what has taken place today is that the deposition is being concluded today. I did not have any opportunity to cross-examine. I don't want to waive my rights . . . . I don't want to waive my ability to cross-examine, and as I understand it it's not going to happen today. Whether it's going to happen another day, I don't know. |
| --- | --- |
| Defense Counsel II: | . . . I had a conversation with [Plaintiff's Counsel] in the hallway before I was planning to question Mr. Walker and decided not to. But it was made clear to me that we would not be given a chance to speak to Mr. Walker tomorrow or later . . . . We were told pretty clearly that the deposition had to conclude today. |

***

| Plaintiff's Counsel: | . . . I'll state I don't think anybody was denied the right to cross-examine. And the reason he can't continue is he's going to be in a terrible, terrible state tomorrow because this was the |
| --- | --- |

---

[11] Although only two defense attorneys are quoted here, nine (9) different defense attorneys were present at the deposition, including counsel for Union Carbide Corporation.

hardest day he's had in months, but I don't know if he's going to be alive on Thursday.

Defense Counsel I: Seven or eight people wouldn't be able to question him right now.

Plaintiff's Counsel: If you had insisted on such, I would have said yes. When I talked to [Defense counsel], I said I'm hoping you won't, and they talked to whoever they talked to and ended up not asking questions.

Defense Counsel I: You're putting us in an impossible position. The poor guy is dying. His sons don't want the deposition to continue now. You're telling us we could have if we wanted to.

\*\*\*

Defense Counsel II: The difference is that we've been presented an incredibly short timeline and a lot of documents that, frankly, contain a lot of information. As I said, you raised probably more questions than not. And ordinarily you would spend a fair amount of time with the witness going through these things which would give us a way to develop our defenses.

It was pretty clear that he would not have the ability to do that today. He couldn't tolerate those kinds of questions or any kinds of long questions or long periods of questioning. And that was my reason for saying let's come back.

But your answer, and I understand it, is that he may not be able to do that, for he's terminal. And so this would be our only day, and this is our only day, and he's not in the best frame of mind. And the general environment was his two sons clearly were objecting to that. I mean, I know they were lobbying you to urge us not to do it.

\*\*\*

Defense Counsel I: I think the poor guy is in horrible shape, and he was deteriorating as we watched it. It would be inhuman for us to ask questions. As much as I would like to ask questions, it's inappropriate. I think he's now bordering on being incompetent to testify. It was evident in the last 10, 15 minutes.

| Defense Counsel II: | There are things he said that he seemed clear about and a number of things that he seemed not to be clear about. But he was getting agitated, and I agree that for any one of us to press him even mildly in questioning would have put us in the unfair position of being the bully, and none of us want to do that, obviously. |
|---|---|

(Id. at 58:22-71:5.)

As evidenced by this conversation, counsel representing Defendants Ingersoll-Rand Company, Warren Pumps, and Blackmer Pump Co. found themselves in an impossible position and ultimately refrained from questioning Decedent. Plaintiff frames this decision as a free and deliberate choice that amounts to a waiver of the right to cross-examine. At the hearing held on February 28, 2018, counsel for Plaintiff stated the following: "Plaintiff's counsel specifically told Defendants, look, here's your shot and the record shows they decided not to follow up and ask questions." (Doc. No. 61 at 29:19-25.) But the choice between a meaningless cross-examination and no-cross examination is not a true choice. Similarly, the opportunity to cross-examine a man who is clearly fatigued and bordering on incompetent is not a true opportunity.

In Derewecki v. Penn R.R., 353 F.2d 436 (3d Cir. 1965), the Third Circuit Court of Appeals addressed whether an incomplete deposition was admissible at trial. There, the court allowed the plaintiff to introduce deposition testimony of a victim where the defendant had already engaged in some meaningful cross-examination before the victim suffered a heart attack. In admitting the testimony, the court concluded that although the defendant might have enjoyed a more robust opportunity to develop the victim's testimony through further cross-examination, it had already extracted sufficient information. The court stated that additional questioning by the defendant "would have elicited little of benefit to the [defendant]."

Derewecki is easily distinguishable from the case at hand. For one, counsel for the defendant in Derewecki had already started its cross-examination when the deponent suffered a heart attack. Here, there was no cross-examination at all from counsel for Defendants Ingersoll-Rand, Warren Pumps, and Blackmer Pump Co. Further, in Derewecki, the court stressed that the defendant had little to gain from additional information that might be gleaned from further questioning. But in this case, Defendants stood to gain crucial information. At the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury. This is a fact-intensive inquiry. Here, counsel for Defendants clearly wished to develop Decedent's testimony to determine whether Decedent encountered their clients' products. But they were unable to do that because of Decedent's deteriorating state of mind, his increasing level of fatigue, and pressure from Plaintiff's counsel and Decedent's family. That counsel for Union Carbide Corporation questioned Decedent is not significant—that attorney was focused on Union Carbide products, not products made by Ingersoll-Rand, Warren Pumps, or Blackmer Pump.

More recently, the Third Circuit addressed Rule 804(b)(1) in Haas v. 3M Co., 613 Fed. App'x 191 (3d Cir. 2015), a products liability case that stemmed from exposure to asbestos-containing products. In Haas, the court found that the district court did not err by admitting the deposition testimony of a deceased witness under Federal Rule of Evidence 804(b)(1) where some, but not all defendants had an opportunity to cross-examine the witness. Id. at 196. Although only one defendant cross-examined the witness, the court found it relevant that all defendants were present during the questioning and all defendants had the opportunity to object and interject with

substantive questions to develop the witness's testimony regarding product identification. The court reasoned:

> The similar-motive requirement assures that "the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do ... if the witness were available to be examined by that party." Kirk v. Raymark Indus., Inc., 61 F.3d 147, 166 (3d Cir.1995) (internal quotation marks omitted). "Similar motive" does not mean identical motive, and whether there was a similar motive is an inherently factual inquiry. United States v. Salerno, 505 U.S. 317, 326, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (Blackmun, J., concurring). Here, the co-defendants evidently agreed to allow Boeing's attorney to be the lead questioner during Brasmer's deposition. Even then, GE's attorney participated in the deposition and had the opportunity to object or interfere if it was deemed necessary. Haas v. 3M Co., No. CIV. A. 12–2944 FLW, 2014 WL 3696043, at *9 (D.N.J. July 24, 2014). Further, Boeing's attorney was able to successfully elicit the information involving the GE-manufactured J79 Engines that provided the basis for GE's summary judgment motion. And Boeing avoided liability by admitting that its parts contained asbestos and raising the "government contractor defense," not by showing some hostility to GE's interests. Boeing did not endeavor to show that GE manufactured the asbestos-containing parts that caused Brasmer's mesothelioma. Id. at *7. Given those circumstances and this particular record, we cannot say that the District Court abused its discretion in ruling that GE's interests were sufficiently similar to Boeing's interests to permit consideration of Brasmer's deposition testimony under Rule 804(b)(1).

Id. (footnotes omitted).

One distinct difference sets this case apart from Haas. In this case, as noted above, counsel for Defendant Union Carbide Corporation cross-examined Decedent. But unlike in Haas, counsel for the defendants sued in the present action were not in the deposition room. They did not have the opportunity to object. They did not have the opportunity to interject with substantive questions. And after counsel for Union Carbide completed its questioning, they did not have an opportunity to commence their own questioning. Consequently, counsel for Defendants did not have the opportunity to develop Decedent's testimony as it related to their respective clients. As explained above, counsel for Union Carbide sought to discover whether Decedent could identify whether he had been exposed to products made by Union Carbide on the U.S.S. Plymouth Rock. This attorney

had no motive to ask questions to determine whether Decedent could identify whether he had been exposed to products made by Ingersoll-Rand Company, Warren Pumps, or Blackmer Pump Co. As a result, it is not significant that counsel for Union Carbide had the opportunity to cross-examine Decedent.

In sum, Defendants Ingersoll-Rand Company, Warren Pumps, and Blackmer Pump Co. did not have a meaningful opportunity to cross-examine Decedent.  For that reason, Decedent's deposition testimony does not fall within the former testimony exception to the hearsay rule and is not admissible at trial.  Thus, the Court will not consider Decedent's deposition here.

**B. Defendants' Motions for Summary Judgment Will Be Denied**

As noted previously, Defendants submit substantially similar arguments in support of their Motions for Summary Judgment.  First, Defendants argue that Plaintiff has not identified sufficient evidence in the record from which a reasonable jury could conclude that their respective products were a substantial factor in causing Decedent's lung cancer.  Second, Defendants contend that they are not liable for asbestos-containing products that may have been added to their pumps after the pumps were sold to the United States Navy.  (See Doc. Nos. 17, 18, 22.)  For the reasons discussed below, the Court is not persuaded by Defendants' arguments.

**1. The Court Will Apply Maritime Law to This Case**

Central to the disposition of Defendants' Motions is what law governs the case.  Defendants ask the Court to apply maritime law in resolving the pending motion (Doc. Nos. 17, 18, 22), while Plaintiff contends that Pennsylvania state law should govern (Doc. Nos. 23, 25, 26).  The Court agrees with Defendants.

The United States Constitution gives federal courts the authority to hear "all Cases of admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2.  Further, "Congress has embodied

that power in a statute," <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 531 (1995), conferring district courts with original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1).

A party seeking to invoke maritime jurisdiction pursuant to Section 1333 in an asbestos-related claim must satisfy a locality test and a connection test. <u>See</u> <u>Connor v. Alfa Laval, Inc.</u>, 799 F. Supp. 2d 455, 458-59 (E.D. Pa. 2011) ("<u>Connor I</u>"). First, "in the case of asbestos-related disease arising from work on or around ships . . . the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters." <u>Id.</u> at 466. A party can satisfy the locality test by demonstrating that the injured party's Navy service was performed at sea aboard Navy vessels. <u>Id.</u>

Second, to meet the connection test, the party urging the court to apply maritime law must show (1) the asbestos exposure alleged had a potentially disruptive impact on maritime commerce, and (2) the allegedly defective products bear a substantial relationship to traditional maritime activity. <u>Id.</u> As to the first prong of the connection test, the court in <u>Connor I</u> held alleged asbestos exposure has a potentially disruptive impact on maritime commerce where that exposure affects a sailor whose job it is to maintain equipment integral to the functioning of the vessel on which he served. In that situation, exposure to a defective product could "potentially slow or frustrate the work being done on the vessel." <u>Id.</u> (quoting <u>John Crane, Inc. v. Jones</u>, 650 S.E.2d 851, 854 (Va. 2007)). Turning to the second prong, the court in <u>Connor I</u> found that an allegedly defective product has a substantial relationship to traditional maritime activity where the product at issue is essential for the proper functioning of the vessel. In that case, the defendant's manufacturing of the allegedly defective product is "so closely related to activity traditionally subject to admiralty

law that the reasons for applying special admiralty rules would apply to the suit at hand." Id. at 469.

Having set forth the locality test and the connection test, the court in Connor I concluded the following:

> . . . [T]he maritime jurisdiction test requires the Court to apply maritime law to those claims involving plaintiffs who were sea-based Navy workers where the allegedly defective product was produced for use on a vessel. By contrast, maritime law does not govern when the asbestos claims asserted stem from predominantly land-based Navy work even if the allegedly defective product was produced for use on a vessel.

Id. at 458-59.

Here, Defendants first submit that maritime law applies because the locality test is satisfied. The Court agrees. Plaintiff asserts that Decedent contracted lung cancer after being exposed to Defendants' asbestos-containing products while working as an electrician in two settings: (1) aboard the U.S.S Plymouth Rock while he served in the Navy, and (2) aboard various other Naval vessels in the Philadelphia Naval Shipyard. Thus, it is clear that the alleged exposure to asbestos occurred on a vessel on navigable waters.

Second, Defendants urge the Court to apply maritime law because both prongs of the connection test are satisfied. Again, the Court agrees. As for the first prong, whether the alleged asbestos exposure has a potentially disruptive impact on maritime commerce, Decedent, an electrician, worked on equipment that was essential to the operation of the U.S.S. Plymouth Rock, the vessel on which he served. As for the second prong, whether the allegedly defective products bear a substantial relationship to traditional maritime activity, Defendants manufacture various types of pumps that are crucial to the functioning of ships while at sea. Consequently, the allegedly defective products are so closely related to activity traditionally regulated by maritime law that the need to apply maritime law to this case is manifest.

In sum, given that the alleged exposure to asbestos occurred on a vessel in navigable waters, and considering that that the allegedly defective product was produced for use on a vessel, the Court will apply maritime law.

## 2. A Reasonable Jury Could Conclude that Defendants' Products were a Substantial Factor in Causing Decedent's Lung Cancer and Death

To succeed on either a negligence theory or a strict liability theory under maritime law in an asbestos-related products liability case, a plaintiff must establish causation. Hendrick v. A.O. Smith Corp., No. 16-476, 2018 WL 2322077, at *3 (E.D. Pa. May 22, 2018) (citing Lindstrom v. A.C. Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005)). To establish causation, a plaintiff must show: "(1) that the plaintiff was exposed to the defendant's product and (2) that the product was a substantial factor in causing the plaintiff's injury." Id. (quoting Connor v. Alfa Laval, Inc., 842 F. Supp. 2d 791, 797 (E.D. Pa. 2012) ("Connor II")).

A plaintiff can show that a defendant's allegedly defective product was a substantial factor in causing his injury through direct evidence or "circumstantial evidence that will support an inference that there was exposure to the defendant's product for some length of time." Abbay v. Armstrong Int'l, Inc., No. 10-83248, 2012 WL 975837, at *1 n.1 (E.D. Pa. Feb. 29, 2012). It is not enough to show "minimal exposure" to defendant's product. Id. Instead, "the plaintiff must show 'substantial exposure' in order to allow a reasonable inference—based on more than conjecture—that the defendant's product was a substantial factor in causing the plaintiff's injury." Hendrick, 2018 WL 2322077, at *3 (citing Lindstrom, 424 F.3d at 492). "[T]he question of 'substantiality' is one of degree normally best left to the fact-finder." Abbay, 2012 WL 975837, at *1 n.1 (citing Redland Soccer Club, Inc. v. Dep't of Army of United States, 55 F.3d 827, 851 (3d Cir. 1995)).

### a.   Defendant Ingersoll-Rand Company

Contrary to Defendant's arguments, Plaintiff has identified evidence in the record from which a reasonable jury could conclude that a fire pump manufactured by Defendant Ingersoll-Rand Company was a substantial factor in causing Plaintiff's lung cancer and death.

First, Plaintiff has demonstrated that an Ingersoll-Rand centrifugal fire pump was located on the U.S.S. Plymouth Rock.  (See Doc. No. 25-6 at 16.)  Second, Plaintiff has shown that a reasonable jury could conclude that the centrifugal fire pump was insulated with an asbestos-containing product.  As noted above, Plaintiff cites to an Ingersoll-Rand Company packing manual for centrifugal pumps that states that (1) centrifugal pumps that pump water ranging from cold to 220 degrees Fahrenheit should be packed with cotton or non-reinforced asbestos, and (2) centrifugal pumps that pump water exceeding 220 degrees Fahrenheit should be packed with reinforced asbestos.  (Doc. No. 25-7.)  Ingersoll Rand Company manufactured a centrifugal fire pump that pumped water for use aboard the U.S.S. Plymouth Rock.  (See Doc. No. 25-6.)  Thus, it is evident that this centrifugal fire pump was insulated with asbestos.

Finally, Plaintiff has demonstrated that it is likely that Decedent was exposed to asbestos fibers as a result of Ingersoll-Rand's fire pump.  According to James Owens, who was Decedent's supervisor aboard the U.S.S. Plymouth Rock, electricians like Decedents worked on every electrical system on the ship.  Further, electricians like Decedent worked in the ship's engine room, where the fire pump was located.  To repair the fire pump, machinists stripped the pump of its asbestos-containing insulation, sending deadly asbestos fibers into the engine room air.

Ingersoll-Rand argues that Plaintiff cannot survive summary judgment because the Ingersoll Rand fire pump was turbine-driven, and not motor-driven, meaning that an electrician would not have worked on it.  (Doc. No. 17 at 14.)  While that may be true, the Court disagrees with Ingersoll-Rand's conclusion.  As evidenced by Mr. Owen's testimony, Decedent would have

spent fifty-percent of his time in the engine room, where machinists stripped asbestos-containing insulation from the fire pump to do repairs. Therefore, even if Decedent did not work directly on the fire pump, a reasonable jury could infer that he was exposed to asbestos fibers from the fire pump's insulation while he stood watch in the engine room over the course of two years on the U.S.S. Plymouth Rock. Whether this level of exposure was "substantial" is a question for the jury.

**b.    Defendant Warren Pumps**

Defendant Warren Pumps argues that there is no evidence that its pumps were a substantial factor in causing Plaintiff's lung cancer and death. The Court disagrees.

First, the evidence shows that there were three different types of pumps manufactured by Warren Pumps aboard the U.S.S. Plymouth Rock: (1) the emergency feed pump; (2) the main circulating pump; and (3) the bilge & fuel oil tank stripping pumps. (Doc. No. 26-6 at 12-15.) Second, the record shows that these pumps required either asbestos-containing parts or asbestos-containing insulation. In his Response to Defendant Warren Pumps' Motion for Summary Judgment, Plaintiff provided documents that demonstrate that Warren Pumps specified that steam cylinders on its main circulating pumps and bilge and fuel oil tank stripping pumps should be "insulated with suitable thickness of 85% magnesia." (Doc. No. 26-7.) Products that were 85% magnesia were generally asbestos-containing products. (Doc. No. 26 at 6.) Additionally, blueprints of pumps manufactured by Warren Pumps shows that these types of pumps contained an asbestos insulation ring. (Id. at 2-3.) Moreover, invoices demonstrate that Warren Pumps supplied the Navy with a myriad of asbestos-containing parts for use on its pumps, including "asbestos sheet gaskets" and "braided asbestos" packing. (Doc. Nos. 26-9, 26-10.)

Finally, Plaintiff has identified evidence from which a reasonable jury could conclude that Decedent was exposed to hazardous asbestos fibers from pumps manufactured by Warren Pumps. Like Defendant Ingersoll-Rand Company, Defendant Warren Pumps contends that it is entitled to

judgment as a matter of law because it is likely that Decedent never worked on turbine-driven pumps, which did not contain electric motors. But this contention fails for the reasons noted above. Defendant also argues that Plaintiff's claim fails because Mr. Owens did not specifically identify a Warren Pumps product. But this argument fails, too. For one, it is unsurprising that Mr. Owens cannot identify specific manufacturers—nearly fifty years passed between this litigation and his time on the U.S.S. Plymouth Rock. Further, the causation standard under maritime law allows a plaintiff to show that a defendant's allegedly defective product was a substantial factor in causing his injury through direct evidence or circumstantial evidence. <u>Abbay</u>, 2012 WL 975837, at *1 n.1. Thus, that Plaintiff lacks direct evidence that Decedent worked on pumps made by Warren Pumps is not fatal. Instead, the fact that Decedent spent fifty-percent of his two years aboard the U.S.S. Plymouth Rock in the ship's engine room where machinists routinely stripped asbestos-containing insulation from Warren Pumps products is circumstantial evidence from which a reasonable jury could find in Plaintiff's favor. Whether that circumstantial evidence is enough to show "substantiality" is a question for the jury.

### c. Defendant Blackmer Pump Co.

As with Defendants Ingersoll-Rand and Warren Pumps, the Court is persuaded that Plaintiff has identified sufficient evidence from which a reasonable jury could conclude that exposure to a pump manufactured by Defendant Blackmer Pump Co. was a substantial factor in causing Decedent's lung cancer.

First, Plaintiff has pointed to evidence that shows that the transfer pump aboard the U.S.S. Plymouth Rock was manufactured by Defendant Blackmer Pump. Second, the Blackmer Pump informational packet cited by Plaintiff demonstrates that pumps made by Blackmer Pump contained asbestos parts or required asbestos-containing parts to function. Finally, Plaintiff has pointed to circumstantial evidence that creates a genuine issue of material fact as to whether

asbestos used in connection with the Blackmer Pump transfer pump aboard the U.S.S. Plymouth Rock caused Decedent's lung cancer. As noted in the previous sections, Mr. Owens testified that Decedent probably worked on every electrical system on the U.S.S. Plymouth Rock. Further, Mr. Owens stated that Decedent spent roughly fifty-percent of his two-years aboard the U.S.S. Plymouth Rock in the ship's engine room. While he stood watch in the engine room, machinists removed asbestos-containing products from pumps like the Blackmer Pump transfer pump. Regardless of whether Decedent worked directly on these pumps, from this circumstantial evidence, a reasonable jury could infer that exposure to Defendant Blackmer Pump's products played a role in Decedent's ultimate death. The question of whether this exposure was a "substantial factor" in causing Decedent's lung cancer is a question for the jury.

### 3. A Reasonable Jury Could Conclude that Defendants are not Entitled to the Bare-Metal Defense

Next, Defendants each assert that the "bare-metal defense" protects them from liability. That is, Defendants contend that they are not liable for asbestos-related injuries because they only manufactured and sold "bare-metal" pumps; any asbestos materials needed for those pumps to function properly were only added later.

In a matter of first impression, the Third Circuit Court of Appeals recently addressed the bare-metal defense in In re: Asbestos Products Liability Litigation (No. VI), 873 F.3d 232, 240 (3d Cir. Oct. 3, 2017), cert. granted Air and Liquid Systems Corp. v. DeVries, 138 S.Ct. 1990 (2018). There, the plaintiffs alleged that their husbands had been exposed to asbestos while serving the United States Navy, and as a result, contracted cancer and died. Id. at 234. In district court, the defendant manufacturers invoked the bare-metal defense in separate motions for summary judgment. Id. at 235. Based on a bright-line application of the bare-metal defense, that a manufacturer of a bare-metal product is never liable for injuries caused by later-added asbestos-

containing materials, the district court granted the manufacturers' motions and dismissed the plaintiffs' claims.  Id.

On appeal, the Third Circuit held that under federal maritime law, the bare-metal defense must be applied as a flexible standard, not a bright-line rule.  In so concluding, the Court articulated the following standard:

> [F]oreseeability is the touchstone of the bare-metal defense; a manufacturer of bare-metal product may be held liable for a plaintiff's injuries suffered from later-added asbestos-containing materials if the facts show the plaintiff's injuries were a reasonably foreseeable result of the manufacturer's failure to provide a reasonable and adequate warning; and although cases will necessarily be fact-specific, already-decided precedents show, for example, that a bare-metal manufacturer may be subject to liability if it reasonably could have known, at the time it placed its product into the stream of commerce, that:
>
> > (1) asbestos is hazardous, and
> >
> > (2) its product will be used with an asbestos-containing part, because
> >
> > > (a) the product was originally equipped with an asbestos containing part that could reasonably be expected to be replaced over the product's lifetime,
> > >
> > > (b) the manufacturer specifically directed that the product be used with an asbestos-containing part, or
> > >
> > > (c) the product required an asbestos-containing part to function properly.

Id. at 240.

### a.  Defendant Ingersoll-Rand Company

Defendant Ingersoll-Rand Company contends that it is not liable for Decedent's lung cancer because it did not make any component parts that contained asbestos.  Instead, it sold its products to the Navy "bare metal."  (Doc. No. 17 at 14-16.)  While it is true that Ingersoll-Rand sold its fire pump "bare metal", Defendant's argument ultimately fails under the Third Circuit's newly articulated standard.

First, a reasonable jury could conclude that Ingersoll-Rand knew that asbestos was hazardous when it sold its fire pump to the United States Navy.  According to the expert report of

Mr. Kenneth Garza, "[t]he hazard of workplace dust, including asbestos, has been recognized since the 1930s . . . ." (Doc. No. 36-7 at 10.)  The United States Navy was aware of the potential hazards of asbestos as early as 1922, and by the 1940s, "the Navy's knowledge regarding the potential hazards of asbestos was quite complete when compared the to the available knowledge at the time." (Doc. No. 1 at 10.)  In 1951, the Walsh-Healy Act implemented regulations to control known workplace hazards, including asbestos dust.  (Id. at 11.)  By 1955, public health and industrial safety experts firmly established the link between asbestos exposure and lung cancer.  (Id. at 12.) By 1965, experts affirmatively linked mesothelioma to exposure to asbestos-containing products. From this circumstantial evidence, it is likely that a reasonable jury could find that Ingersoll-Rand knew of the dangers of asbestos exposure when it pumps to the Navy.

Second, a reasonable jury could conclude that Ingersoll-Rand knew that its fire pump required asbestos-containing insulation to function properly.  In its Response to Defendant Ingersoll-Rand's Motion for Summary Judgment, Plaintiff cites to an Ingersoll-Rand packing manual for centrifugal pumps, like the one aboard the U.S.S. Plymouth Rock.  The manual emphasized that (1) centrifugal pumps that pump water ranging from cold to 220 degrees Fahrenheit should be packed with cotton or non-reinforced asbestos, and (2) centrifugal pumps that pump water exceeding 220 degrees Fahrenheit should be packed with reinforced asbestos. (Doc. No. 25-7.)  Moreover, the manual states that "[n]o pump will give satisfactory, trouble-free operation over long periods unless particular care and attention are given to the selection and installation of the type of packing best suited for the liquid to be handled and the service conditions under which the pump is to operate."  (Id.)  From this manual, a reasonable jury could find that Ingersoll-Rand knew that its centrifugal fire pump required asbestos-containing insulation to function.

In sum, there exists genuine issues of material fact as to (1) whether Ingersoll-Rand knew that asbestos was hazardous when it sold fire pumps to the Navy, and (2) whether Ingersoll-Rand knew that its fire pump required asbestos-containing products to function properly. As a result, Plaintiff has produced evidence sufficient to survive summary judgment.

### b. Defendant Warren Pumps

Defendant Warren Pumps also relies on the bare-metal defense to argue that it is not liable for Decedent's lung cancer. It argues that it is not responsible for Decedent's death because it did not manufacture or sell any products that contained asbestos. But as discussed above, this argument lacks merit under the standard set forth by the Third Circuit.

As an initial matter, it is disputed that Warren Pumps' products were "bare-metal." Blueprints of a Warren Pump emergency feed pump and a Warren Pump bilge and fuel oil tank stripping pump show that these pumps contained an insulating ring made of asbestos. (Doc. No. 26-8.) It is unclear whether the insulating ring was installed before or after the pumps were sold to the Navy.

But even if Warren Pumps' products did not contain asbestos when shipped, genuine issues of material fact exist as to whether it is entitled to the bare-metal defense. First, for the reasons given in the preceding section, evidence exists from which a reasonable jury could find that Warren Pumps knew that asbestos was hazardous when it sold pumps to the United States Navy for use aboard the U.S.S. Plymouth Rock.

Second, a reasonable jury could find that Warren Pumps knew that its products required asbestos-containing products to function properly. As reiterated above, Plaintiff has identified evidence that Warren Pumps specified that its pumps required asbestos-containing insulation. (Doc. No. 26-7.) Further, invoices show that Warren Pumps supplied the Navy with a myriad of

asbestos-containing parts for use on its pumps, including "asbestos sheet gaskets" and "braided asbestos" packing. (Doc. Nos. 26-9, 26-10.)

For these reasons, a reasonable jury could find that Defendant Warren Pumps is not entitled to the bare-metal defense. Plaintiff has identified evidence that creates genuine issues of material fact as to (1) whether Warren Pumps knew that asbestos was hazardous when it sold pumps to the Navy, and (2) whether Warren Pumps knew that its products required hazardous asbestos-containing parts to function. Consequently, the Court will deny Defendant Warren Pumps' Motion for Summary Judgment.

### c. Defendant Blackmer Pump Co.

Finally, Defendant Blackmer Pump Co. contends that it is entitled to the bare-metal defense because it did not manufacture or sell asbestos-containing products to the United States Navy aboard the U.S.S. Plymouth Rock. The Court disagrees.

First, it is unclear whether the pumps sold for use aboard the U.S.S. Plymouth Rock contained asbestos. According to the 1936 Blackmer Pump advertisement provided by Plaintiff, Blackmer Pump claimed that its pumps came equipped "with every desirable feature." (Doc. No. 23-8.) And per a Blackmer Pump informational packet cited by Plaintiff, pumps manufactured by Blackmer Pump contained "teflon impregnated asbestos" packing and an asbestos gasket. (Doc. No. 23-7.) Consequently, there exists a genuine issue of material fact as to whether pumps manufactured by Blackmer Pump were in fact "bare metal" when sold.

But regardless of whether the Blackmer Pump transfer pump was sold bare metal, a reasonable jury could conclude that (1) Blackmer Pump knew that asbestos was dangerous when it sold pumps to the Navy, and (2) Blackmer Pump knew that its pumps required asbestos-containing products to function properly. As above, evidence in the record demonstrates that Blackmer Pump probably knew that asbestos was dangerous when it manufactured and sold its

transfer pump for use aboard the U.S.S. Plymouth Rock. Additionally, evidence shows that Blackmer Pump likely knew that its pumps required asbestos products. Indeed, Plaintiff has identified evidence that shows that pumps manufactured by Blackmer Pump either contained "teflon impregnated asbestos" packing and an asbestos gasket or required "teflon impregnated asbestos" packing and an asbestos gasket to function. (Doc. No. 23-7.)

As a result, genuine issues of material fact exist as to whether Defendant Blackmer Pump Co. is entitled to summary judgment. Accordingly, the Court will deny Defendant's Motion and give Plaintiff his day in court.

## V.    CONCLUSION

For the foregoing reasons, Defendant Ingersoll-Rand Company's Motion for Summary Judgment (Doc. No. 17) will be denied, Defendant Warren Pumps' Motion for Summary Judgment (Doc. No. 18) will be denied, and Defendant Blackmer Pump Co.'s Motion for Summary Judgment (Doc. No. 22) will be denied. An appropriate Order follows.